**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| VOLT POWER, LLC | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | Civil Case No.: 5:21-cv-216 |
| | § | |
| AXIS POWER, LLC, JUSTIN | § | |
| GRAHAM, ALEX GRAHAM, | § | |
| SAMUEL "SAMMY" CHRISTIAN, | § | |
| ALFREDO "FREDDY" CHAVEZ, | § | |
| DANIEL WELCH, AND LANCE | § | |
| BROWN | § | |

**VOLT POWER, LLC'S ORIGINAL VERIFIED COMPLAINT**
**AND APPLICATION FOR TEMPORARY RESTRAINING ORDER,**
**PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION**

Plaintiff Volt Power, LLC ("Volt") files this Original Verified Complaint and Application for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction against Defendants Axis Power, LLC ("Axis"), Justin Graham, Alex Graham, Samuel "Sammy" Christian ("Christian"), Alfredo "Freddy" Chavez ("Chavez"), Daniel Welch ("Welch") and Lance Brown ("Brown") and respectfully shows as follows:

## I.     INTRODUCTION

1.      Volt brings this lawsuit because its former employees, Justin Graham, Freddy Chavez, Daniel Welch, and Lance Brown misappropriated Volt's proprietary information and trade secrets – violating Volt's policies, their employment and contractual duties, and federal and state law – before departing Volt. Based on the forensic information currently available to Volt, many of the individual Defendants absconded with a high volume of Volt's data and files – apparently to undercut Volt's ability to compete in the market and for the benefit of themselves and Axis.

2.     Alex Graham and Sammy Christian are former executives that retired from Volt in 2018 and then formed Axis in September 2020. However, Alex Graham and Sammy Christian violated their post-employment contractual obligations to Volt when they solicited Volt employees to staff their competitive business prior to the expiration of their respective restrictive covenants. Brown has also solicited Volt employees and, by doing so, violated his post-employment contractual obligations to Volt. Volt brings this action against Defendants seeking immediate injunctive relief directing Defendants not to use Volt's information and ordering immediate sequestration and return of Volt's property and preventing the individual Defendants from further violating their contractual obligations to Volt.

## II.     THE PARTIES

3.     Plaintiff Volt Power, LLC is a limited liability company formed under the laws of the state of Delaware, with its principal place of business at 3100 Interstate North Circle SE, Suite 100, Atlanta, Georgia 30339.

4.     Axis Power, LLC is a limited liability company formed under the laws of the State of Texas, with its principal place of business at 325 Breezy Point, Lakehills, Texas 78063 and its registered agent, Alex Graham, can be served at the same address, or wherever he may be found.

5.     Alex Justin ("Justin") Graham is a Texas resident residing at 1273 Whispering Water, Spring Branch, Texas 78070, or wherever he may be found.

6.     Alex H. Graham is a Texas resident residing at 8930 HWY 173 N, Hondo, Texas 78861, or wherever he may be found.

7.     Samuel "Sammy" Christian is a Texas resident residing at 3910 N. Dowlen Rd, Beaumont, Texas 77726, or wherever he may be found.

8.     Alfredo "Freddy" Chavez is a Texas resident residing at 3833 N County Road, Sebastian, Texas 78594, or wherever he may be found.

9.     Daniel Welch is a Texas resident residing at 900 27th St, Woodville, Texas 75979, or wherever he may be found.

10.    Lance Brown is a Texas resident residing at 26719 Adonis Dr., San Antonio, Texas 78260, or wherever he may be found.

## III.    JURISDICITION AND VENUE

11.    The Court has jurisdiction over the lawsuit under 28 U.S.C. § 1331 because two of Plaintiff's claims arise under federal law: The Computer Fraud and Abuse Act, 18 U.S.C. § 1030 and The Defend Trade Secrets Act, 18 U.S.C. § 1836. The Court has jurisdiction over Volt's other claims in this lawsuit pursuant to 28 U.S.C. § 1367(a).

12.    The Court has personal jurisdiction over Defendants because they are citizens of, and reside in, Texas.

13.    Venue is proper in this district pursuant to the provisions of 28 U.S.C. §§ 1391(a)(2), 1391(b) and 1391(d), because a substantial part of the events giving rise to these claims occurred in this district.

## IV.    FACTUAL BACKGROUND

### A.    Volt's Business and Protection of its Information.

14.    Volt is an industry-leading provider of overhead and underground utility construction, maintenance, and repair services including electrical, cable, and telecommunications. *See* Exhibit A, Declaration of Derek Staedtler ("Staedtler Dec.") at ¶ 3. Volt constructs, installs, repairs, inspects, maintains, and replaces electrical transmission and distribution power lines throughout the Southwest, Midwest, Southeast, and the Eastern United States. *Id.*

15.     Volt serves a diverse range of customers. *Id.* Indeed, Volt operates throughout the United States including: Texas; Oklahoma; Kansas; Louisiana; Mississippi; Arkansas; Illinois; Ohio; Kentucky; Tennessee; Alabama; Georgia; Florida; South Carolina; North Carolina; West Virginia; and Virginia. *Id.* In providing its services, Volt has invested and continues to invest significant time, money, and energy in researching customer needs, developing market plans, creating pricing structures, and cultivating meaningful relationships with its customers. *Id.*

16.     Volt's accumulation and application of its trade secret information contributes to the development of its relationships with its customers.  *Id.* at ¶ 4. Thus, Volt takes significant steps to protect its trade secrets.  *Id.*  Those trade secrets include customer lists with contact information, profit and loss data, margins, customers' purchase prices, suppliers' prices, research strategies and formulas, customers' preferences and needs, price lists, and other technical information.  *Id.* Only certain individuals within Volt, with a legitimate business need to access and use the information on Volt's behalf, have access to Volt's trade secrets and confidential business information. *Id.* at ¶ 5. Additionally, Volt's employees – including the individual Defendants – acknowledge Volt's policies regarding the use of its electronic systems. *Id.* Specifically, Volt employees must protect and make proper use of Volt assets:

> We each have a duty to protect the assets of the Company that have been entrusted to us and ensure their efficient use. Theft, carelessness, and waste have a direct impact on our profitability. All of us must take measures to prevent damage to and theft or misuse of company property. ***When you leave us, all of the Company's property that has been entrusted to you must be returned to the Company***. Except as specifically authorized, our assets, including our credit, time, equipment, materials, resources, vehicles, and proprietary information, must be used for company business purposes only.

*See* Exhibit A-1, Volt Code of Business Conduct (the "Code of Conduct") at p. 12 (emphasis added). In other words, the individual Defendants understood the scope of their access to the

Company's assets and information while employed with Volt and that theft or other misuse exceeded that authorization. *Id.*

17.     Volt employees also have an obligation to protect and keep confidential the Company's trade secrets and commercially sensitive business information. *Id.* at p. 13. The Code of Conduct specifically identifies information that Volt treats as confidential and/or proprietary trade secret information:

> Sensitive information such as financial information, customer data, marketing, and strategic plans are examples of our confidential information and/or proprietary trade secret information. The Company's confidential information includes, without limitation, all non-public information that might be of use to competitors, or harmful to us or the customers we serve, if disclosed. In addition, during the course of performing your responsibilities, you may obtain confidential information concerning possible transactions with other companies or receive information concerning other companies which we may be required to maintain as confidential.

*Id.* The Code of Conduct unequivocally prohibits disclosure or use of Volt's trade secrets and commercially sensitive business information in ways that are detrimental to the Company's rights and interests:

> ***You must maintain the confidentiality of information entrusted to you by us or our customers***, unless disclosure is necessary to prevent an injury or accident, authorized by the Company or the owner of the information, or legally mandated by a court or governmental agency. ***Employees who possess or have access to confidential information or trade secrets must***:
>
> •       ***Not use the information for their own benefit or the benefit of persons inside or outside of the Company***.
>
> •       ***Carefully guard against disclosure of that information to people outside the Company***. For example, you should not discuss such matters with family members or business or social acquaintances or in places where the information may be overheard.
>
> •       ***Not disclose confidential information to another Company employee unless the employee needs the information to carry out business responsibilities***.

*Id.* (emphasis added). Volt employees may not even share confidential information with other Volt employees who do not have a business necessity for obtaining knowledge of Volt's trade secrets and commercially sensitive business information. *Id.*

18.     The individual Defendants also had an obligation to safeguard Volt's trade secrets and commercially sensitive business information after their employment with Volt ended. Among other things, the Code of Conduct required that the individual Defendants to return all Company information, including customer information, to Volt upon termination of employment:

> Your obligation to treat information as confidential does not end when you leave the Company.  Upon the termination of your employment, *you must return everything that belongs to us, including all documents and other materials containing our and customers' confidential information.* You must not disclose or use confidential information to or for a new employer or to or for others after your employment with us ends.  This obligation remains regardless of the reason for termination of your employment. Likewise, you may not disclose your previous employer's confidential information to us, but you should use the general skills and knowledge that you acquired during your previous employment.

*Id.* (emphasis in original).

19.     Daniel Welch was Volt's Regional Manager, Safety when he voluntarily resigned on September 4, 2020. Staedtler Dec. at ¶ 6. Welch signed an acknowledgment regarding his obligations to protect and return all Volt property in his position following termination of his employment. *See* Exhibit A-2. Welch also had access to Volt's trade secrets and other commercially sensitive business information during his employment. Staedtler Dec at ¶ 6.

20.     Freddy Chavez was a General Foreman with Volt when his employment with Volt ended on November 10, 2020. Staedtler Dec. at ¶ 7. Chavez also had access to Volt's trade secrets and other commercially sensitive business information during his employment. Staedtler Dec at ¶ 7. Chavez signed an acknowledgment regarding his obligations to protect and return all Volt property in his possession following termination of his employment. *See* Exhibit A-3.

21.     Lance Brown was a Division Manager – Distribution, with Volt when he voluntarily resigned his employment on October 30, 2020. Staedtler Dec. at ¶ 8. Brown also had access to Volt's trade secrets and other commercially sensitive business information during his employment. Staedtler Dec at ¶ 8. Brown signed an acknowledgment regarding his obligations to protect and return all Volt property in his position following termination of his employment. *See* Exhibit A-4.

22.     Brown also accepted a promotion to be Volt's Division Manager – Distribution, on May 1, 2020. *See* Exhibit A-5. Brown's promotion included post-employment obligations regarding restrictions on his ability to compete unfairly with Volt. *Id.* at pp. 4-7. Specifically, Brown agreed not to compete with Volt for six months after the termination of his employment, for any reason. *Id.* at p. 4. Similarly, Brown agreed not to solicit Volt's employees or clients for six months after his employment with Volt ended. *Id.* at p. 5-6.

23.     Justin Graham was one of Volt's Division Managers when he voluntarily resigned on September 24, 2019. Staedtler Dec. at ¶ 9. Justin Graham's post-employment contractual obligations included a two-year non-competition and non-solicitation of employees and customers restrictive covenant agreement with Volt. *See* Exhibit A-7, Third Amended and Restated Limited Liability Company Agreement of PowerTeam Services HoldCo, LLC (the 'LLC Agreement") at Section 4.6, pp. 22-25, and Exhibit A-6 Justin Graham Subscription Agreement. Specifically, after the Company purchased T&D Solutions Holdings, LLC ("T&D Solutions") and Associated Diversified Services Holdings, LLC ("ADS"), it offered Justin Graham 3,500 Subscription Units in exchange for Justin Graham's payment and agreement to abide by the provisions of the LLC Agreement. *See* Exhibit A-6 at Section 2 on p.1. The LLC Agreement indicates that members agree

to abide by the Company's written policies, which would include the Code of Conduct, since failure to do could result in termination for cause. *See* Exhibit A-7 at p. 16.

24.     Alex Graham and Sammy Christian founded T&D Solutions. Staedtler Dec. at ¶ 12. Alex Graham and Sammy Christian sold T&D Solutions to PowerTeam Services Holdco, LLC (f/k/a Volt Power Holdco, LLC) on December 7, 2012. Staedtler Dec. at ¶ 12. Alex Graham and Sammy Christian are individual signatories to the LLC Agreement. Staedtler Dec. at ¶ 12.

25.     Alex Graham retired from Volt in March 2018 and signed a separation and retirement agreement that addressed his post-employment obligations with Volt in the LLC Agreement. *See* Exhibit A-8. Sammy Christian also retired from Volt in March 2018 and signed a retirement agreement that addressed his post-employment obligations with Volt in the LLC Agreement. *See* Exhibit A-9 (Exhibits A-8 and A-9 referred to collectively as the "Retirement Agreements"). In the Retirement Agreements, Alex Graham and Sammy Christian agreed to extend the restricted period for the restrictive covenants in the LLC Agreement in exchange for retention of Holdover Units after their retirement, among other things. *See* Exhibits A-8 and A-9 at ¶ 2(i)(i).

26.     Alex Graham and Sammy Christian formed Defendant Axis Power, LLC on or about September 25, 2020, (although they delayed Axis' "effective date" and chose September 29, 2020 – the day after their post-employment obligations to Volt expired). *See* Axis Power Certificate of Formation attached as Exhibit B.

27.     Axis Power, LLC competes with Volt directly in the overhead and underground utility construction, maintenance, and repair services markets in Texas. Staedtler Dec. at ¶ 14.

   **B.     Defendants Misappropriate Volt's Trade Secrets.[1]**

---

[1] Volt has not attached any of the trade secret documents to this Complaint, since it would have to seal them.  Instead, Volt offers to produce the documents that Defendants misappropriated *in camera* should the Court so request.

28.     Volt engaged Noel Kersh ("Kersh") with Pathway Forensics ("Pathway") to assist with a forensic investigation related to the individual employees' departures from Volt. *See* Exhibit C, Declaration of Noel Kersh ("Kersh Dec.") at ¶ 5. Kersh's investigation revealed that many of the individual Defendants transferred data to external storage devices just prior to their departures from Volt. *See* Kersh Dec. at ¶¶ 8-21.

29.     On August 23, 2020 (approximately one week before Welch quit), Welch connected more than 20 external USB devices to his password protected, Volt-issued computer. Kersh Dec. at ¶ 8. During the periods of connectivity, Welch transferred numerous files to various external storage devices. Kersh Dec. at ¶¶ 8-10. Specifically, between 10:28 a.m. and 10:44 a.m. Welch transferred the following files and folders to a "Backup Plus" storage device, which is an external hard drive with the serial number NAB5J17L and volume serial number 5EF55ABF:

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Path | Target Created (CST/CDT) | Volume Name | Volume Serial Number |
| 2 | G:\thumb drives\Rigging | 08/23/2020 10:44:07 AM | Backup Plus | 5EF55ABF |
| 3 | G:\thumb drives\Dist Grounding Rules | 08/23/2020 10:42:32 AM | Backup Plus | 5EF55ABF |
| 4 | G:\thumb drives\accident investigation | 08/23/2020 10:42:29 AM | Backup Plus | 5EF55ABF |
| 5 | G:\thumb drives\New folder | 08/23/2020 10:42:28 AM | Backup Plus | 5EF55ABF |
| 6 | G:\thumb drives\class | 08/23/2020 10:34:04 AM | Backup Plus | 5EF55ABF |
| 7 | G:\thumb drives\OSHA RECORDKEEPING | 08/23/2020 10:32:48 AM | Backup Plus | 5EF55ABF |
| 8 | G:\thumb drives\OSHA eTOOLS | 08/23/2020 10:32:48 AM | Backup Plus | 5EF55ABF |
| 9 | G:\thumb drives\LOUISIANA SAFETY RELATED SERVICES - AGENCIES | 08/23/2020 10:32:47 AM | Backup Plus | 5EF55ABF |
| 10 | G:\thumb drives\JOB SAFETY ANALYSIS | 08/23/2020 10:32:47 AM | Backup Plus | 5EF55ABF |
| 11 | G:\thumb drives\HAZARD COMMUNICATION | 08/23/2020 10:32:47 AM | Backup Plus | 5EF55ABF |
| 12 | G:\thumb drives\FREE PPT's, PICTURES, CLIP ART, MEETING INFO SITES | 08/23/2020 10:32:47 AM | Backup Plus | 5EF55ABF |
| 13 | G:\thumb drives\EMERGENCY RESPONSE | 08/23/2020 10:32:47 AM | Backup Plus | 5EF55ABF |
| 14 | G:\thumb drives\EH & S INFORMATION LIBRARY | 08/23/2020 10:32:47 AM | Backup Plus | 5EF55ABF |
| 15 | G:\thumb drives\COSS | 08/23/2020 10:32:46 AM | Backup Plus | 5EF55ABF |
| 16 | G:\thumb drives\CONSTRUCTION | 08/23/2020 10:32:46 AM | Backup Plus | 5EF55ABF |
| 17 | G:\thumb drives\CONFINED SPACES | 08/23/2020 10:32:46 AM | Backup Plus | 5EF55ABF |
| 18 | G:\thumb drives\CFR's | 08/23/2020 10:32:46 AM | Backup Plus | 5EF55ABF |
| 19 | G:\thumb drives\CDC (CENTER FOR DISEASE CONTROL) - NIOSH | 08/23/2020 10:32:46 AM | Backup Plus | 5EF55ABF |
| 20 | G:\thumb drives\__ MACOSX - Copy | 08/23/2020 10:32:46 AM | Backup Plus | 5EF55ABF |
| 21 | G:\thumb drives\VENDOR SAFETY MAGAZINES & WEB PAGES | 08/23/2020 10:32:42 AM | Backup Plus | 5EF55ABF |
| 22 | G:\thumb drives\US CHEMICAL SAFETY BOARD | 08/23/2020 10:32:42 AM | Backup Plus | 5EF55ABF |
| 23 | G:\thumb drives\Securell | 08/23/2020 10:32:10 AM | Backup Plus | 5EF55ABF |
| 24 | G:\thumb drives\SAFETY FORMS & TOOLS | 08/23/2020 10:32:08 AM | Backup Plus | 5EF55ABF |
| 25 | G:\thumb drives\PROFESSIONAL ORGANIZATIONS & RESOURCES | 08/23/2020 10:32:06 AM | Backup Plus | 5EF55ABF |
| 26 | G:\thumb drives\OTHER OSHA LINKS | 08/23/2020 10:32:06 AM | Backup Plus | 5EF55ABF |
| 27 | G:\thumb drives\ISN RAVS Plus Required Documents | 08/23/2020 10:30:05 AM | Backup Plus | 5EF55ABF |
| 28 | G:\thumb drives | 08/23/2020 10:28:49 AM | Backup Plus | 5EF55ABF |
| 29 | G:\thumb drives | 08/23/2020 10:28:49 AM | Backup Plus | 5EF55ABF |

Kersh Dec. at ¶ 9. At approximately 10:30 a.m. on August 23, 2020, Welch transferred the following files/folders to an external "Verbatim Store N Go" storage device, serial number 07991009C9CC98C5:

| | A Path | B Target Created (CST/CDT) | C Volume Name | D Volume Serial Number |
|---|---|---|---|---|
| 1 | Path | Target Created (CST/CDT) | Volume Name | Volume Serial Number |
| 2 | F:\__MACOSX - Copy | 08/23/2020 10:30:56 AM | STORE N GO | A12791E1 |
| 3 | F:\BLS - BUREAU of LABOR STATISTICS - Copy | 08/23/2020 10:30:56 AM | STORE N GO | A12791E1 |

Kersh Dec. at ¶ 10.

30.     Welch used another external storage device to transfer backups from his Volt computer on July 31, 2020. Specifically, on July 31, 2020, Welch transferred the following backup files to a Seagate Ultra Slim PL external storage device, serial number NA7VXY9X:

| | A Path | B Target Created (CST/CDT) | C Volume Name | D Volume Serial Number |
|---|---|---|---|---|
| 1 | Path | Target Created (CST/CDT) | Volume Name | Volume Serial Number |
| 2 | H:\july back up\Desktop\work in process | 07/31/2020 02:54:48 PM | Seagate Backup Plus Drive | D23E9BFE |
| 3 | H:\july back up\Pictures | 07/31/2020 02:44:58 PM | Seagate Backup Plus Drive | D23E9BFE |
| 4 | H:\july back up\Documents | 07/31/2020 02:44:24 PM | Seagate Backup Plus Drive | D23E9BFE |
| 5 | H:\july back up\Desktop | 07/31/2020 02:44:18 PM | Seagate Backup Plus Drive | D23E9BFE |
| 6 | H:\july back up\Downloads | 07/31/2020 02:43:30 PM | Seagate Backup Plus Drive | D23E9BFE |
| 7 | H:\july back up | 07/31/2020 02:42:18 PM | Seagate Backup Plus Drive | D23E9BFE |
| 8 | H:\july back up | 07/31/2020 02:42:18 PM | Seagate Backup Plus Drive | D23E9BFE |

Kersh Dec. at ¶ 11.

31.     Many of the files that Welch transferred are not only unique to Volt; they are also documents that Volt treats as trade secret. *See* Staedtler Dec. at ¶ 11. Welch had access to Volt's information to perform work for Volt's benefit. However, Welch abused his access to Volt's property when he spent the days and weeks prior to his departure collecting Volt property to use for his own benefit and the benefit of his new employer, Axis. Welch also quit Volt and indicated he planned to work with the Grahams at Axis nearly a month before Alex Graham and Christian allegedly "formed" Axis as a Texas limited liability company. Staedtler Dec. at ¶ 6.

32.     Welch never informed anyone at Volt that he was using external storage devices in the days and weeks leading up to his departure to transfer Volt property. Staedtler Dec. at ¶ 11.

33.     Welch is not the only Volt employee that misappropriated Volt's property. Chavez's employment with Volt ended on November 10, 2020. However, before Chavez resigned, he downloaded Volt's trade secrets and commercially sensitive business information to external storage devices from his password protected Volt computer. Kersh Dec. at ¶¶ 12-15. Between November 3 and 4, 2020, Chavez transferred the following folders to a Western Digital My Passport external storage device, volume serial number F23A51E7:

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Path | Target Created (CST/CDT) | Volume Name | Volume Serial Number |
| 2 | D:\2019 NEW VOLT MASTER TIMESHEET'S | 11/04/2020 08:49:24 AM | My Passport | F23A51E7 |
| 3 | D:\FREDDY'S FOLDERS | 11/03/2020 02:59:33 PM | My Passport | F23A51E7 |
| 4 | D:\MVEC CREW HOURLY SHEETS | 11/03/2020 02:46:38 PM | My Passport | F23A51E7 |
| 5 | D:\MVEC CREW HOURLY FORMS | 11/03/2020 02:46:31 PM | My Passport | F23A51E7 |

Kersh Dec. at ¶ 13. The "D:\FREDDY'S FOLDERS" item that Chavez transferred contains a number of files that Volt considers its trade secrets. Staedtler Dec. at ¶ 11. Additionally, after Chavez transferred the "Freddy's Folders" item to his external device, he deleted it from the desktop of his Volt computer. Kersh Dec. at ¶ 14. Pathway attempted to recover the deleted items in the "Freddy's Folder" item but could only recover a partial list because when a user "double deletes" data it is not possible to recover the full contents. Kersh Dec. at ¶ 14.

34.     Chavez never informed anyone at Volt that he was using external storage devices in the days and weeks leading up to his departure to transfer Volt property. Staedtler Dec. at ¶ 11. Pathway also determined that Chavez performed a factory reset on his Volt-issued iPad before returning it to Volt. Kersh Dec. at ¶ 15. A factory reset on an iPad renders any information on the device permanently unrecoverable unless the user performed a complete iCloud/iTunes backup prior to the reset. Kersh Dec. at ¶ 15. Pathway searched for a backup on Chavez's Volt computer but did not locate one. Kersh Dec. at ¶ 15.

35.     Justin Graham also used external storage devices to transfer Volt trade secrets and commercially sensitive business information from his password protected Volt computer. Kersh

Dec. at ¶¶ 16-19. Specifically, on August 30, 2019 (25 days before he quit), Justin Graham attached

a General UDisk USB Device, serial number 6&22b59cc4 to his Volt computer for the last time.

Kersh Dec. at ¶ 17. However, Pathway discovered a significant amount of file activity on this USB

device on September 25, 2019 that did not occur on Justin Graham's Volt computer. Kersh Dec.

at ¶ 18. In fact, Graham accessed 1,990 specific files from this USB device on September 25, 2019

including the following files:



| | A | B | C |
|---|---|---|---|
| 1 | Full Path | Last Accessed | Hash Value |
| 2 | C:\Client List\Copy of TD Reference List.xlsx | 09/25/2019 00:00:00 | 1a922ed0aea72fd33d432519ede9741b |
| 3 | C:\Client List\Copy of Chain Electric Phonelist CPSE.xlsx | 09/25/2019 00:00:00 | 587391b851935712f58e236c224013b6 |
| 4 | C:\Austin Energy Bid\Austin Energy Units Official Spreadsheet.xlsx | 09/25/2019 00:00:00 | 1d23692d15e97b1b4f97740b74475b03 |
| 5 | C:\BID JOBS\2017-2020 Magic Valley Amendment Proposal - Hand Digging.doc | 09/25/2019 00:00:00 | 2b4a9070ab4433989d0ecaeadcbb9e63 |
| 6 | C:\BID JOBS\Alterman Bid - Kalahari Project.xls | 09/25/2019 00:00:00 | a2545 5f95898680e5baf037483e330a9 |
| 7 | C:\BID JOBS\Bid Approval form PEC trench (250 ft).xlsx | 09/25/2019 00:00:00 | d3163e58f32e3edbee1d1a171ccbd503 |
| 8 | C:\BID JOBS\Bid Approval form PEC-Wildflower Center Trench.xlsx | 09/25/2019 00:00:00 | 9466f5df6b92ae1d68ff4962443a9585 |
| 9 | C:\BID JOBS\Bid Crystal Hills Quote.docx | 09/25/2019 00:00:00 | 75f62120ccac9517c54b6aa36051ac34 |
| 10 | C:\BID JOBS\Bid PEC Oak Hill Trench Dasher.docx | 09/25/2019 00:00:00 | e59397a75a5a3b6a3e07e4a5e1988189 |
| 11 | C:\BID JOBS\Bid Proposal Citizens Hospital - Enchanted Rock.doc | 09/25/2019 00:00:00 | a0c02454b2c50114f4e316780347be632 |
| 12 | C:\BID JOBS\BID PROPOSALS PEC RFP 2015.xlsx | 09/25/2019 00:00:00 | 5b513a2e8d25564cf0fdbe0e6750c6b8 |
| 13 | C:\BID JOBS\Bid Quote Longhorn River Ranch.xlsx | 09/25/2019 00:00:00 | ae5f0aff49ce412f36604a32f98a9315 |
| 14 | C:\BID JOBS\bid tabulation for PEC Oak Hill Dasher.xlsx | 09/25/2019 00:00:00 | 761d601c1feddc240c80cfe9d6ae4d50 |
| 15 | C:\BID JOBS\Copy of Estimate Oncor bids.xlsx | 09/25/2019 00:00:00 | 98bc5b9c3e1ba9339ec985f0b8ed1e80 |
| 16 | C:\Bluebonnet\2019 Maintenance Bid.xlsx | 09/25/2019 00:00:00 | 02708dfe049a116504ce63c226560100 |
| 17 | C:\Bluebonnet\BBEC BID SHEET SECT1-4.xlsx | 09/25/2019 00:00:00 | e6ec571c42fe9d5a861a241983e07698 |
| 18 | C:\Bluebonnet\Bid Tabulation SHEET PG10 FM 2104 Reconductor BBEC.xlsx | 09/25/2019 00:00:00 | e32b3811d50959cf9c22170bde0cc742 |
| 19 | C:\Bluebonnet\Bluebonnet Bid Job ANADARKO MAASS WATER WELL #1.docx | 09/25/2019 00:00:00 | 546c1c227fb4c4ef834100812 7a106a3 |
| 20 | C:\Boerne Bid\FOR BID - Old San Antonio Road.zip | 09/25/2019 00:00:00 | ccd5129969649a37c93a1702a9bb891e |
| 21 | C:\BTU Bid\BID_059-09-16 spec - BID DOCUMENT_059-09-06.pdf | 09/25/2019 00:00:00 | 557486fea2ad43e91ed1e77b5b2ddab7 |
| 22 | C:\City Of Granbury\Final City of Granbury Bid Units - Proposal 2019.xlsx | 09/25/2019 00:00:00 | abb9b8b5babcc4b1f5c7df2dddbe8733 |
| 23 | C:\FP&L\Copy of Exhibit E1 - Bid Form - Storm 02 28 17 -VOLT POWER 082819.xlsx | 09/25/2019 00:00:00 | 8e197fc08848a25ae1fde9d308382d47 |
| 24 | C:\Mid-South Synergy\Mid-worksheet 2018 Mid South Construction Units-Hourly.xlsx | 09/25/2019 00:00:00 | 47de7aced69538179746fb77944c6f88 |
| 25 | C:\Oncor\Copy of Estimate Oncor bids.xlsx | 09/25/2019 00:00:00 | 98bc5b9c3e1ba9339ec985f0b8ed1e80 |
| 26 | C:\PEC Bid Document_2017-2022_12 2016.pdf | 09/25/2019 00:00:00 | eff6230c092833568711ab35b8d10619 |
| 27 | C:\PEC BID JOB\Blanco\10-29-18 & 10-30-18.xlsx | 09/25/2019 00:00:00 | 0e5af862b5d0f0fa89c8db21e86ba310 |
| 28 | C:\PEC BID JOB\Blanco\Master Promax PEC- Blanco- Devils 138KV Bid Breakdown LB.XLSX | 09/25/2019 00:00:00 | 0651f6293b83fbdc85bcf83929e88c57 |
| 29 | C:\PEC CONTRACT 2017\Overhead Contract\PEC Bid Document_2017-2022_12 2016.pdf | 09/25/2019 00:00:00 | 0b6367532cb04009bb101a22d034f2c1 |
| 30 | C:\PEC CONTRACT 2019\Attachment B Part One- PEC Billing Unit Bid Sheet - OH_URD.xlsx | 09/25/2019 00:00:00 | 7ab34aa79a1fbcc4e5b7c3ccea2e4b62 |
| 31 | C:\PEC Invitation to Bid Letter-final.pdf | 09/25/2019 00:00:00 | 04ae613e3f3c4e05b62db2869cdab111 |
| 32 | C:\PEC Unit Calculator\Master Promax PEC- Blanco- Devils 138KV Bid Breakdown LB.XLSX | 09/25/2019 00:00:00 | 5ce99ab500df39ebb822dec5b50ece17 |
| 33 | C:\RGEC\Copy of Southern Bid Worksheet RGEC 2018.xls | 09/25/2019 00:00:00 | d217a13476b49de29174eec60d59fbb4 |
| 34 | C:\RGEC\Copy of Western Bid worksheet RGEC 2018.xls | 09/25/2019 00:00:00 | d7778faa8472fadcbb6352819 3f7529a |
| 35 | C:\San Patricio\Invitation to Bid Letter_2.23.18.pdf | 09/25/2019 00:00:00 | 0953f9753508d56c88802c3c8217b1ad |
| 36 | C:\San Patricio\SPEC Bid Document RUS 790_2018-2021_2.23.18.pdf | 09/25/2019 00:00:00 | efe1cf6ed3af14f77ca594db82512 2dc |
| 37 | C:\SHECO\Santa Fe Project Bid form.xlsx | 09/25/2019 00:00:00 | d5993463337ef7844d68e688c0ab8410 |

Kersh Dec. at ¶ 18. The folders Justin Graham transferred to this external storage device contain

documents and files that Volt considers trade secret or otherwise commercially sensitive business

information. Staedtler Dec. at ¶ 11. Justin Graham never informed anyone at Volt that he was using

external storage devices to transfer Volt property in the days and weeks leading up to his departure. *Id.*

36.     Pathway also determined that Justin Graham performed a factory reset on his Volt-issued phones before returning them. Kersh Dec. at ¶ 19. A factory reset on an iPhone renders any information on the device permanently unrecoverable unless the user performed a complete iCloud/iTunes backup prior to the reset. Kersh Dec. at ¶ 19. Pathway searched for a backup on Graham's Volt computer but did not locate one. Kersh Dec. at ¶ 19.

37.     Brown also used external storage devices to transfer Volt information from his password protected Volt computer prior to his departure from Volt. Kersh Dec. at ¶¶ 20-21. Specifically, on September 15, 2020, Brown transferred the files in the table below to a Flash USB Disk Drive, which has a serial number 3727061873B1838021088:

| | Path | Target Created (CST/CDT) | VSN | Device Serial/UID |
|---|---|---|---|---|
| 1 | Path | Target Created (CST/CDT) | VSN | Device Serial/UID |
| 2 | D:\backup\2020_09_15 @ 08_19_30\PEC\A_B_reel#1\A-B-reel#1_001_S15.SOR | 09/15/2020 08:20:24 AM | C0520E64 | 3727061873B1838021088 |
| 3 | D:\backup\2020_09_15 @ 08_19_30 | 09/15/2020 08:20:38 AM | C0520E64 | 3727061873B1838021088 |
| 4 | D:\backup\2020_09_15 @ 08_19_30\PEC\A_B_reel#1 | 09/15/2020 08:20:37 AM | C0520E64 | 3727061873B1838021088 |

Kersh Dec. at ¶ 21. Brown never informed anyone at Volt that he was using external storage devices to transfer Volt property in the days and weeks leading up to his departure. Staedtler Dec. at ¶ 11.

###     C.    Alex Graham, Justin Graham, Lance Brown and Sammy Christian Breach their Restrictive Covenants.

38.     Alex Graham, Justin Graham, and Sammy Christian signed a restrictive covenant agreement with the Company in exchange for access to confidential and proprietary information related to the Company's future operations, business strategy, and financial planning. *See* Exhibit A-7 at § 4.6. The restrictions in the LLC Agreement prohibit Alex Graham, Justin Graham, and Sammy Christian from competing with Volt for two years. *See* Exhibit A-7 at § 4.6(a). The LLC

Agreement also prohibited Alex Graham, Justin Graham, and Sammy Christian from soliciting Volt's employees for two years. *Id.*at § 4.6(c). Similarly, the LLC Agreement prohibits Alex Graham, Justin Graham, and Sammy Christian from soliciting Volt customers that were customers during the 12-month period prior to the date they ceased holding equity units in the Company. *Id.* at § 4.6(d).

39.     Justin Graham voluntarily resigned from Volt on September 24, 2019 and his two-year restricted period under the LLC Agreement started on that date. As such, the LLC Agreement prohibits Justin Graham from competing with Volt or soliciting its employees and customers until September 24, 2021.

40.     Alex Graham and Sammy Christian retired from the Company on March 6, 2018. *See* Exhibits A-8 and A-9. The Restricted Period in the LLC Agreement ends two years from the date that Alex Graham's and Sammy Christian's employment with Volt ends "unless [the Parties] mutually agree to a longer period." *See* Exhibit A-7 at p. 15 defining "Restricted Period." The Retirement Agreements specifically state that the parties agreed to extend the restricted period for the restrictive covenants in the LLC Agreement for 2 years from the date Alex Graham and Sammy Christian cease to be Inactive Management Members of the Company in exchange for the retention of certain Holdover Units, among other things, following their retirement from the Company. *See* Exhibits A-8 and A-9 at ¶ 2(i)(i). Alex Graham and Sammy Christian ceased being Inactive Management Members on September 28, 2018, which means that their post-employment obligations to Volt did not expire until September 28, 2020.

41.     On September 4, 2020, Daniel Welch announced his resignation from Volt. Staedtler Dec. at ¶ 6. Welch would not state specifically where he planned to work but implied that he would be working with Alex Graham and Sammy Christian. *Id.* However, Axis was not

even a legal entity until September 29, 2020, nearly a month after Welch announced his resignation from Volt and informed Volt of his intentions. Welch's LinkedIn profile indicates that he is working for Axis.

42.     Cody Graham voluntarily terminated his employment with Volt on September 27, 2020. Staedtler Dec. at ¶ 10. Chuck Chaddrick's ("Chaddrick") and Darren Causey's ("Causey") employment with Volt ended on September 29, 2020. Staedtler Dec. at ¶ 10. Lance Brown ("Brown") voluntarily quit Volt on October 30, 2020. Staedtler Dec. at ¶ 8. Since Brown quit Volt, he has solicited Volt employees to leave Volt in violation of his post-employment obligations to Volt. Staedtler Dec. at ¶ 8. Chavez's employment with Volt ended on November 10, 2020. Staedtler Dec. at ¶ 7.

43.     On information and belief, Volt understands that the individuals referenced above are now Axis employees or are otherwise performing work on its behalf. As an example, Causey is listed as Axis' registered agent in Louisiana. *See* Axis Certificate of Formation for Louisiana attached as Exhibit D. Causey, Chaddrick, and Brown bid a customer job for Volt in August 2020 and Volt understood that the customer selected it to perform the work. Staedtler Dec. at ¶ 14. In October 2020, Volt learned that the customer abruptly sent the project out for competitive pricing after receiving Volt's initial estimate. Staedtler Dec. at ¶ 14. Volt requested a chance to submit a new bid based on the availability of additional information provided to the competitive bidders, which it submitted on January 20, 2021. Staedtler Dec. at ¶ 14. However, the team (Chaddrick, Causey, and Brown) that estimated the project for Volt initially were no longer with Volt and presumably performing work on behalf of Axis. Staedtler Dec. at ¶ 14. Volt learned on February 4, 2021 that the customer awarded the project to Axis. Staedtler Dec. at ¶ 14.

44. In addition to losing key employees, as described above, Volt has also lost multiple crews to Axis. Staedtler Dec. at ¶ 10. Volt contends that Alex Graham, Sammy Christian, Justin Graham, and Lance Brown, or individuals acting on their behalf, are recruiting and soliciting its employees to join them at Axis in violation of their post-employment obligations to Volt.

## V. CAUSES OF ACTION

### A. Count 1—Against All Defendants: Violation of The Computer Fraud & Abuse Act, 18 U.S.C. § 1030.

45. Volt, without waiving the foregoing, realleges and incorporates the allegations set forth above.

46. The Computer Fraud and Abuse Act ("CFAA") applies to any computers used in interstate commerce and provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." *See* 18 U.S.C. § 1030(g).

47. The civil action provision applies whenever a person: (1) intentionally accesses a computer without authorization or exceeds authorized access and thereby obtains information from any protected computer (18 U.S.C. § 1030(a)(2)(C)); (2) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value (18 U.S.C. § 1030(a)(4)); or (3) knowingly causes the transmission of a command, and as a result of such conduct intentionally causes damage without authorization to a protected computer, or intentionally accesses a protected computer without authorization and causes damage or loss (18 U.S.C. § 1030(5)(A), (B), or (C)).

48. Another requirement of any civil cause of action brought under any of these subsections is that the plaintiff sustains a loss due to the conduct at issue in excess of $5,000 for

any one-year period.  This $5,000 loss can be accounted for by the cost to the Plaintiff of investigating and attempting to remediate the Defendant's conduct.

49.     Volt's computers are used in interstate commerce, and thus are "protected computers," because Volt conducts business in a large region of the United States.  Further, Volt has suffered a loss well in excess of $5,000 because of Defendants' conduct.  Accordingly, Volt sues Defendants under all of the theories of recovery detailed above.

50.     When the Individual Defendants accessed Volt documents from various storage accounts as described above, they obviously did so to obtain Volt's confidential information and trade secrets.

51.     The Individual Defendants violated several of Volt's policies by accessing its computer network, acting against its interest, and taking its information.  Accordingly, they acted "without authorization" for purposes of all of the pertinent provisions of the CFAA, and "exceed[ed] authorized access" for purposes of all of the pertinent provisions of the CFAA.  Indeed, by their conduct, The Individual Defendants acted outside the course and scope of their employment—actually contrary to the course and scope of their employment—when they knowingly acted adverse to Volt interests.  Their conduct was obviously contrary to the intended use of Volt computer system.

52.     Further, Defendants acted knowingly and with intent to defraud.  This is already demonstrated in this record by the fact that the Individual Defendants surreptitiously took Volt documents.  They knew this was against company policy and had no legitimate reason for taking these documents. Yet they maintained the masquerade of loyal employees of Volt while misappropriating company property for the benefit of themselves and their presumed new

employer, Axis. Accordingly, Volt's only option is to sue Defendants to recover its information and prevent further misuse of its trade secret and confidential information.

53.     Defendants' conduct caused Volt damages because it had to hire computer forensic experts to identify the documents the Individual Defendants took and attempt to determine the extent of their unauthorized conduct.  The cost of this recovery easily exceeds $5,000.

54.     Volt seeks injunctive relief, requiring Defendants to return its property and information, retain no copies, and produce all devices, computers, storage accounts, and email accounts on which its files have been copied, placed, stored, transferred or maintained to the custody of Pathway Forensics for preservation and inventory. Volt also requests that the Court enjoin the Individual Defendants from performing any work on behalf of Axis, or any other company that competes with Volt, until there is verifiable forensic evidence that they do not possess or have the ability to access Volt property.

55.     Volt further seeks a judgment that Defendants violated the Computer Fraud and Abuse Act.

**B.      Count 2—Against All Defendants: Violation of the Defend Trade Secrets Act.**

56.     Volt, without waiving the foregoing, realleged and incorporated the allegations set forth above.

57.     Under the Defend Trade Secrets Act ("DTSA") a trade secret is any information that the owner has "taken reasonable measures to keep such information secret and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).  The files that the Individual Defendants took qualify as trade secret because the information derives economic value

for Volt and is not generally known to third parties outside of the company. Further, through its various policies, Volt has exerted significant efforts to maintain the secrecy of the information.

58.     Moreover, through their various actions, the Individual Defendants illegally stole, copied, downloaded, transmitted, destroyed, and altered Volt's trade secrets—in violation of 18 U.S.C. § 1832(a).

59.     Accordingly, Volt seeks injunctive relief to prevent Defendants from committing any future and further violations and conditions placed on their employment as well as damages associated with the loss caused by the misappropriation of the trade secret and Defendants' unjust enrichment. 18 U.S.C. § 1836(3). Volt also requests that the Court enjoin the Individual Defendants from performing any work on behalf of Axis, or any other company that competes with Volt, until there is verifiable forensic evidence that they do not possess or have the ability to access Volt property. Moreover, because Defendants' actions were willful and malicious, Volt also seeks its attorney's fees and exemplary damages. *Id.*

**C.      Count 3—Against All Defendants: Violation of the Texas Uniform Trade Secrets Act.**

60.     Volt, without waiving the foregoing, realleges and incorporates the allegations set forth above.

61.     The documents that the Individual Defendants took—which included customer lists and sales and marketing strategies—meet the definition of a "trade secret" under the Texas Uniform Trade Secrets Act. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(6). This information derives economic value for Volt is not generally known to third parties outside of the company. Further, through its various policies, Volt has exerted significant efforts to maintain the secrecy of the information.

62.     As shown above, the Individual Defendants violated Volt's policies and used improper means to acquire and disclose Volt's trade secret information. Accordingly, the

Individual Defendants are in violation of the Texas Civil Practice and Remedies Code § 134A.001, *et seq.*

63.     Volt seeks injunctive relief to prevent Defendants from committing additional violations.  *See* TEX. CIV. PRAC. & REM. CODE § 134A.003(a).  Volt also requests that the Court enjoin the Individual Defendants from performing any work on behalf of Axis, or any other company that competes with Volt, until there is verifiable forensic evidence that they do not possess or have the ability to access Volt property. Volt also seeks damages for any past misappropriation of trade secrets under Texas Civil Practice and Remedies Code § 134A.004.  Moreover, because Defendants' actions were willful and malicious, Volt seeks its attorney's fees and exemplary damages under Texas Civil Practice and Remedies Code § 134A.005(3) and 134A.004(b).

**D.      Count 4—Against Daniel Welch, Justin Graham, Freddy Chavez, and Lance Brown: Breach of Fiduciary Duty.**

64.     Volt, without waiving the foregoing, realleges and incorporates the allegations set forth above.

65.     Volt imposed significant trust in Welch, Justin Graham, Chavez, and Brown during their employment at Volt.   Indeed, they were permitted to work independently with little supervision, had close contact with Volt's customers, and were provided access to Volt's trade secrets and confidential information.

66.     Volt trusted Welch, Justin Graham, Chavez, and Brown to protect and develop Volt's business interests and act in the best interest of at all times.  For these reasons, Welch, Justin Graham, Chavez, and Brown were, whether formally or informally, fiduciaries to Volt.  Welch, Justin Graham, Chavez, and Brown were also a fiduciaries to Volt because each held a management position with the Company.  They were, therefore, required to deal in the best of good faith with Volt and to refrain from self-dealing.  In sum, they owed a duty of utmost loyalty to Volt.

67.     As described above, Welch, Justin Graham, Chavez, and Brown engaged in self-dealing and other conduct that was directly contrary to Volt's interest by stealing its property. Welch, Justin Graham, Chavez, and Brown also engaged in self-dealing by siphoning work from Volt for their own benefit and the benefit of their new employer. Thus, Welch, Justin Graham, Chavez, and Brown have breached their fiduciary duties by the conduct described above.

68.     Volt requests injunctive relief to prevent Welch, Justin Graham, Chavez, and Brown from profiting from their breaches and specifically requests that the Court order them, and any company in which they are acting in the interest of (which includes Axis), to disgorge any profits made from businesses the Individual Defendants acquired from the breach of their fiduciary duties.

69.     Further, Welch, Justin Graham, Chavez, and Brown committed their actions with legal malice, such that Volt is entitled to recover, and requests, exemplary damages pursuant to Texas Civil Practice and Remedies Code § 41.001 *et. seq.*

**E.     Count 5—Against Alex Graham, Sammy Christian, Lance Brown, and Justin Graham: Breach of Contract.**

70.     Volt, without waiving the foregoing, realleges and incorporates the allegations set forth above.

71.     The LLC Agreement is a valid and enforceable contract. *See* Exhibit A-7

72.     Volt entered the LLC Agreement with Alex Graham, Sammy Christian, and Justin Graham to protect its business goodwill, customer relationships, trade secrets, and other commercially sensitive business information. Volt performed all of its obligations under the LLC Agreement. In return for access to and use of Volt's trade secrets and business goodwill, Alex Graham, Sammy Christian, and Justin Graham agreed not to compete with Volt as described above for two years after they ceased being Inactive Management Members of the Company. Likewise,

Alex Graham, Sammy Christian, and Justin Graham agreed that for two years they would not solicit customers that had ongoing or planned business with the Company during the year prior to their separation. Alex Graham, Sammy Christian, and Justin Graham also agreed that for two years they would not solicit Volt employees that were not separated from employment with Volt for at least six months.

73.     Brown's May 1, 2020 promotion to Division Manager – Distribution at Volt included restrictive covenants intended to protect Volt's business goodwill, customer relationships, trade secrets, and other commercially sensitive information. Specifically, Brown agreed that he would not compete with Volt or solicit Volt's customers or employees for six months following his departure from the Company.

74.     The scope of the restrictive covenants are reasonable and necessary to protect Volt's legitimate business interests.

75.     Axis is Volt's direct competitor in the overhead and underground utility construction, maintenance, and repair services including electrical, cable, and telecommunications. Alex Graham and Sammy Christian officially "formed" Axis Power, LLC on September 25, 2020; however, they delayed the effective date of the formation until September 29, 2020 – i.e. just one day after their restrictive covenant obligations to Volt expired. However, as indicated above, Welch quit Volt on September 4, 2020 to work for Axis, nearly a month before Axis formed under the laws of the State of Texas. Volt contends that Alex Graham, Justin Graham, and Sammy Christian solicited Welch, and others, to join Axis even before Axis officially formed as a company. The pre-formation solicitation is clear from the coordinated exodus of Volt employees starting on September 4, 2020. Additionally, although it is unclear whether Brown is officially working for Axis, he has solicited various Volt employees to quit in violation of his post-employment obligations.

76.     Alex Graham's, Justin Graham's, Lance Brown's, and Sammy Christian's various breaches of their post-employment obligations to Volt caused Volt to suffer monetary damages, which it seeks to recover.

77.     There is also a substantial risk – based on Defendants' brazen breaches of their post-employment restrictive covenants – that unless enjoined, Defendants will continue to violate their contractual obligations to Volt and calculating any monetary damages that they will inflict by their future breaches will be extremely difficult. Therefore, Volt seeks a temporary restraining order, preliminary injunction, and permanent injunction enjoining Alex Graham and Sammy Graham from violating the Agreement for at least the same amount of time they were able to violate it undetected before their restrictions expired. Volt also seeks a temporary restraining order, preliminary injunction, and permanent injunction enjoining Justin Graham and Lance Brown from any further violations of their contractual obligations to Volt.

78.     Absent immediate injunctive relief, Volt is without an adequate remedy at law because the difficulty in ascertaining the full measure of harm Defendants inflicted by their various breaches renders any amount of monetary damages insufficient to compensate Volt for its losses.

## VI.     PRAYER FOR RELIEF

Volt Power, LLC respectfully requests that the Defendants be cited to appear and answer, and respectfully requests that this Court award:

1.     Judgment against Defendants for violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030;

2.     Judgment against Defendants for violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836;

3.     Judgment against Defendants for violation of the Texas Uniform Trade Secrets Act;

4.     Judgment against the individual Defendants for breach of fiduciary duty;

5.  Judgment against Alex Graham, Justin Graham, Lance Brown, and Sammy Christian for breach of contract;

6.  Damages suffered as a result of Defendants' actions;

7.  A temporary restraining order, preliminary injunction, and permanent injunction against Alex Graham, Justin Graham, Lance Brown and Sammy Christian preventing them from further breaching their restrictive covenant agreements with Volt;

8.  A temporary restraining order, preliminary injunction, and permanent injunction against all Defendants preventing further misappropriation and/or disclosure and use of Volt's trade secrets and commercially sensitive business information and enjoining the Individual Defendants from performing any work on behalf of Axis, or any other company that competes with Volt, until there is verifiable forensic evidence that they do not possess or have the ability to access Volt property;

9.  Costs and attorneys fees;

10. Exemplary damages;

11. Pre-judgment and post-judgment interest as provided by law; and

12. Any other relief to which Volt may be justly entitled.

Respectfully submitted,

**EVERSHEDS SUTHERLAND (US) LLP**

By: */s/ Scott R. McLaughlin*
Scott R. McLaughlin
State Bar No. 00791234
John T. Hays
State Bar. No. 24101885
1001 Fannin, Suite 3700
Houston, TX 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
ScottMcLaughlin@eversheds-sutherlin.us
JohnHays@eversheds-sutherlin.us

*Attorneys for Volt Power, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on this 4th day of March, 2021, a true and correct copy of the foregoing document was filed with the Court's Electronic Case Filing system, which will provide electronic notification of its filing to all counsel who have appeared in this action.

*/s/ Scott. R. McLaughlin*
Scott R. McLaughlin
